UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA

NANCY LOUISE NUNEZ,  )    No. EDCV 13-2131 AGR
                     )
          Plaintiff, )
                     )    MEMORANDUM OPINION AND
                     )    ORDER
     v.              )
                     )
CAROLYN W. COLVIN,   )
Commissioner of Social Security )
                     )
          Defendant. )
_____)

     Plaintiff Nancy Louise Nunez filed this action on November 26, 2013.  (Dkt. No. 4.)  Pursuant to 28 U.S.C. § 636(c), the parties consented to proceed before the magistrate judge.  (Dkt. Nos. 9, 10.)  On July 21, 2014, the parties filed a Joint Stipulation ("JS") that addressed the disputed issues.  The court has taken the matter under submission without oral argument.

     Having reviewed the entire file, the court affirms the decision of the Commissioner.

# I.

## PROCEDURAL BACKGROUND

On August 5, 2010, Nunez filed an application for disability insurance benefits alleging an onset date of July 25, 2009. Administrative Record ("AR") 24, 147-53. The application was denied initially and on reconsideration. AR 24, 88-89. Nunez requested a hearing before an Administrative Law Judge ("ALJ"). AR 101. On February 24, 2012, the ALJ conducted a hearing at which Nunez and a vocational expert ("VE") testified. AR 45-87. On March 2, 2012, the ALJ issued a decision denying benefits. AR 24-38. On September 25, 2013, the Appeals Council denied the request for review. AR 1-7. This action followed.

# II.

## STANDARD OF REVIEW

Pursuant to 42 U.S.C. § 405(g), this court has authority to review the Commissioner's decision to deny benefits. The decision will be disturbed only if it is not supported by substantial evidence, or if it is based upon the application of improper legal standards. *Moncada v. Chater*, 60 F.3d 521, 523 (9th Cir. 1995) (per curiam); *Drouin v. Sullivan*, 966 F.2d 1255, 1257 (9th Cir. 1992).

"Substantial evidence" means "more than a mere scintilla but less than a preponderance – it is such relevant evidence that a reasonable mind might accept as adequate to support the conclusion." *Moncada*, 60 F.3d at 523. In determining whether substantial evidence exists to support the Commissioner's decision, the court examines the administrative record as a whole, considering adverse as well as supporting evidence. *Drouin*, 966 F.2d at 1257. When the evidence is susceptible to more than one rational interpretation, the court must defer to the Commissioner's decision. *Moncada*, 60 F.3d at 523.

**III.**

**DISCUSSION**

**A.    Disability**

A person qualifies as disabled, and thereby eligible for such benefits, "only if his physical or mental impairment or impairments are of such severity that he is not only unable to do his previous work but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy." *Barnhart v. Thomas*, 540 U.S. 20, 21-22, 124 S. Ct. 376, 157 L. Ed. 2d 333 (2003) (citation omitted).

**B.    The ALJ's Findings**

Following the five-step sequential analysis applicable to disability determinations, *Lounsbury v. Barnhart*, 468 F.3d 1111, 1114 (9th Cir. 2006),[1] the ALJ found that Nunez has the severe impairments of degenerative disc disease, status post motor vehicle accident, status post decompression/fusion, history of left shoulder impingement, degenerative joint disease of the right knee, and mild carpal tunnel syndrome.  AR 26. Her impairments do not meet or equal a listing.  AR 27.

The ALJ found that Nunez has the residual functional capacity ("RFC") to perform sedentary work with occasional postural activities.  AR 27.  She is precluded from climbing ladders, ropes or scaffolds.  She cannot operate foot controls.  She requires a sit/stand option every 45 minutes.  She is precluded from overhead reaching and is limited to frequent reaching in all other directions.  She can perform frequent manipulation.  *Id.*  She is precluded from concentrated exposure to extreme cold or vibration, working near hazards, repetitive motion of the neck, work requiring her to keep her neck in a fixed position for more than 15 minutes at a time, extremes of neck

_____

[1]  The five-step sequential analysis examines whether the claimant engaged in substantial gainful activity, whether the claimant's impairment is severe, whether the impairment meets or equals a listed impairment, whether the claimant is able to do his or her past relevant work, and whether the claimant is able to do any other work. *Lounsbury*, 468 F.3d at 1114.

3

motion, and complex work due to pain and the effects of medication.  AR 27-28.  She is unable to perform any past relevant work, but she has transferable skills and could transition to work as an appointment clerk, a job that exists in significant numbers in the national economy.  AR 36-37.

### C.    Step Five of the Sequential Analysis

Nunez contends the VE's testimony did not provide substantial evidence to support the ALJ's finding at step five that she had transferable skills.

At step five, the Commissioner bears the burden of demonstrating there is other work in significant numbers in the national economy the claimant can do.  *Lounsbury*, 468 F.3d at 1114.  If the Commissioner satisfies this burden, the claimant is not disabled and not entitled to disability benefits.  If the Commissioner cannot meet this burden, the claimant is disabled and entitled to disability benefits.  *Id.*

"There are two ways for the Commissioner to meet the burden of showing that there is other work in 'significant numbers' in the national economy that claimant can do:  (1) by the testimony of a vocational expert, or (2) by reference to the Medical-Vocational Guidelines at 20 C.F.R. pt. 404, subpt. P, app. 2."  *Id.*  In doing so, the ALJ must pose a hypothetical to the VE that outlines the limitations of the particular claimant.  *Delorme v. Sullivan*, 924 F.2d 841, 850 (9th Cir. 1991).  When finding at step five that a claimant can transition to other semi-skilled or skilled work, the ALJ must identify specific transferable work skills and specific occupations to which the acquired work skills are transferable.  *See Bray v. Comm'r*, 554 F.3d 1219, 1223-26 (9th Cir. 2009) (interpreting Social Security Ruling ("SSR") 82-41, 1982 WL 31389, at *7 (Jan. 1, 1982)).[2]

---

[2]  Social Security rulings do not have the force of law.  Nevertheless, they "constitute Social Security Administration interpretations of the statute it administers and of its own regulations," and are given deference "unless they are plainly erroneous or inconsistent with the Act or regulations."  *Han v. Bowen*, 882 F.2d 1453, 1457 (9th Cir. 1989).

The ALJ found Nunez not disabled at step five because of transferable work skills from her past relevant work as a registered nurse.  AR 37.  The transferable skills include recordkeeping skills, organizational skills, computer skills and the ability to use office equipment.  *Id.*  Accepting the VE's testimony, the ALJ determined that based on Nunez's RFC, age, education and transferable work skills, she could perform the job of appointment clerk, Dictionary of Occupational Titles ("DOT") 237.367-010.[3]  *Id.*

Nunez argues that the VE's testimony on the subject of transferability of skills is "inconsistent" with the legal standard outlined in SSR 82-41.  She contends that "[t]he taking and recording of information related to nursing constitute occasional and incidental parts of the work and constitute a small [sic] of the work performed by [her] and 'would not [. . . ] give a meaningful vocational advantage over unskilled work.'"  JS 10 (quoting SSR 82-41, 1982 WL 31389, at *3).

SSR 82-41 states, in relevant part:

When the issue of skills and their transferability must be decided, the . . . ALJ is required to make certain findings of fact and include them in the written decision.  Findings should be supported with appropriate documentation.

When a finding is made that a claimant has transferable skills, the acquired work skills must be identified, and specific occupations to which the acquired work skills are transferable must be cited in the . . . ALJ's decision . . . .  It is important that these findings be made at all levels of adjudication to clearly establish the basis for the determination or decision for the claimant and for a reviewing body including a Federal district court.

1982 WL 31389, at *7.  The term "skill" is defined as:

---

[3]  The DOT raises a rebuttable presumption as to job classification.  *Johnson v. Shalala*, 60 F.3d 1428, 1435 (9th Cir. 1995).

knowledge of a work activity which requires the exercise of significant judgment that goes beyond the carrying out of simple job duties and is acquired through performance of an occupation which is above the unskilled level (requires more than 30 days to learn).  It is practical and familiar knowledge of the principles and processes of an art, science or trade, combined with the ability to apply them in practice in a proper and approved manner.  This includes activities like making precise measurements, reading blueprints, and setting up and operating complex machinery.  A skill gives a person a special advantage over unskilled workers in the labor market.

*Id.* at *2.  The term "transferability" means "applying work skills which a person has demonstrated in vocationally relevant past jobs to meet the requirements of other skilled or semiskilled jobs."  *Id.*

The VE's testimony about Nunez's transferable skills is consistent with SSR 82-41.  Nunez bases her argument on a section from SSR 82-41 regarding the semi-skilled work of nurse aides.  JS 10; SSR 82-41, 1982 WL 31389, at *3.  Nunez was not a nurse aide.  The only reference to the skilled job of nurse in the section on which Nunez relies is a statement that taking and recording the rates of temperature, pulse and respiration, and recording food and liquid intake and output are a small part of a nurse's job.  SSR 82-41, 1982 WL 31389, at *3.  Nunez's argument is not persuasive.

As the Commissioner argues, transferability is most probable going from a skilled to a semiskilled job when, as here, a lesser degree of skill is required.  SSR 82-41, 1982 WL 31389, at *5.  The VE testified that Nunez's past work as a nurse was at a skill level of SVP 7.[4]  AR 71.  Nunez had the relevant transferable skills of basic

---

[4]  The DOT provides a "specific vocational preparation ("SVP") time for each occupation.  *See* Social Security Ruling 00-4p.  The SVP corresponds to the skill level required to complete a given job.  The DOT assigns an SVP of 1-2 for unskilled work, 3-4 for semi-skilled work, and 5-9 for skilled work.  *Id.*

organization, decision making, basic recordkeeping and the ability to use typical office equipment.[5]  AR 77, 81.  Based on the ALJ's hypothetical, the VE identified the job of appointment clerk with an SVP of 3.  AR 77.  The VE testified:

> Organizational ability is learned on occupations.  Some occupations don't require organizational ability . . . to the extent that others do.  So – and keeping in mind we're going from an SVP 7, which has to be highly organized, very very good complex decision making . . . skills, we're going down to an SVP 3 that has very limited skills and so basic.

AR 82; *see also* SSR 82-41, 1982 WL 31389, at *5 ("Generally, the greater the degree of acquired work skills, the less difficulty an individual will experience in transferring skills to other jobs except when the skills are such that they are not readily usable in other industries, jobs and work settings.").  According to the VE, an appointment clerk uses the following organizational skills:

> Organizing, keeping the records organized, keeping appointments organized, keeping your daily work flow organized.  I have to make these x number of appointments, so I need to call x number of people.  I'm going to call them in this order.  This person works so I need to move this person down to the afternoon so I can contact – so that I can reach them when I contact them.  Very basic organizational skill, nothing highly complex.  But they are there.

---

[5]  Nunez testified that, as a nurse, she did "total patient care where [she] pretty much [was] responsible for all of their needs, medications, charting, lifting, transferring."  AR 79.  She occasionally used a computer "to put an order in."  *Id.*

The transferable skills identified by the VE have broad applicability across industry lines.  *See* SSR 82-41, 1982 WL 31389, at *6 ("[W]here job skills have universal applicability across industry lines, e.g., clerical, professional, administrative, or managerial types of jobs, transferability of skills to industries differing from past work experience can usually be accomplished with very little, if any, vocational adjustment . . . .").

AR 83.  The VE acknowledged that organizational skills in the registered nurse job would be more complex than in the appointment clerk job.  AR 84.  However, the rules regarding transferability of skills for persons of advanced age do not apply here since Nunez was 51 at the time of the decision.  AR 84; *see* 20 C.F.R. § 404.1568(d)(4).

Nunez argues the VE never testified whether her past relevant work as a nurse would permit her to "meet" the requirements of the appointment clerk job.  She contends the ALJ merely inquired whether the work of an appointment clerk would "involve transferable skills."  *See* AR 78.  The following exchange took place:

> ALJ:  So with the RFC indicated and the transferrable skills from the past work, appointment clerk would be available at sedentary?
>
> VE:  I do believe, yeah.

AR 77.  Contrary to Nunez's argument, the VE testified that her transferable skills would meet the requirements of the appointment clerk job.

Nunez contends that "[t]ransferability does not exist between a nurse and an appointment clerk when using the universally recognized methodology of work fields and MPSMS [materials, products, subject matter, and services] codes."  JS 19.  She contends that "[u]se of SVP, work fields, and MPSMS codes has long stood as the only acceptable methodology [of determining transferability]."  JS 18 (citing "Transferable Skills Analysis and Vocational Information During a Time of Transition" *Journal of Forensic Vocational Analysis*, Vol. 6(1), Truthan, J.A. & Karman, S.E. (2003) (JS at Exh. 2)).  She argues that since the work fields and MPSMS codes for nurse and appointment clerk do not match, the "meet" requirement of 20 C.F.R. § 404.1568(d)(1) is not satisfied.  *See* JS at Exh. 4.

The VE cited the DOT and testified Nunez could perform the job of appointment clerk.  AR 71, 77; DICOT 075.364-010 (nurse) and DICOT 237.367-010 (appointment clerk).  She did not testify regarding work fields or MPSMS codes.  Nunez provides no legal authority for her contention that the VE must rely on matching work fields and

1   MPSMS codes when analyzing transferability.[6]  The regulation specifies that a complete

2   similarity of degree of skill, tools and machinery used, and raw materials, products,

3   processes or services involved "is not necessary for transferability."  20 C.F.R. §

4   404.1568 (d)(3); *see also Garcia v. Astrue*, 2012 WL 4091847, at *7 n.6 (E.D. Cal. Sept.

5   17, 2012) (while the Truthan and Karman article indicates that a researcher of

6   Transferable Skills Analysis had "asserted the use of Work Field and MPSMS as the

7   only true method for transferable skills analysis," "this assertion does not support

8   Plaintiff's contention that the MPSMS is the only method to address transferable skills").

9        The ALJ's step five determination is supported by substantial evidence.  The ALJ

10  properly relied on the VE's testimony.  The ALJ did not err.

11       **D.    Opinion of Examining Physician**

12       Nunez contends the ALJ erred in rejecting the opinion of her examining

13  psychologist, Dr. Gamboa.

14       An examining physician's opinion constitutes substantial evidence when it is

15  based on independent clinical findings.  *Orn v. Astrue*, 495 F.3d 625, 631 (9th Cir.

16  2007).  An ALJ may reject an uncontradicted examining physician's medical opinion

17  based on "clear and convincing reasons."  *Carmickle v. Comm'r of Soc. Sec. Admin.*,

18  533 F.3d 1155, 1164 (9th Cir. 2008) (citation and quotation marks omitted).  When an

19  examining physician's opinion is contradicted, "it may be rejected for 'specific and

20  legitimate reasons that are supported by substantial evidence in the record.'"  *Id.*

21  (citation omitted).

22       The record contains Dr. Gamboa's psychiatric evaluation report dated January 6,

23  2011.  AR 532-36.  Dr. Gamboa diagnosed major depressive disorder and assigned a

24  _____

25  [6] Nunez cites *Horton v. Astrue*, 2010 WL 985234, *4 (E.D. Mo. 2010), a case in

26  which the VE testified to transferability based on a complete match of the MPSMS
    codes.  Nunez cites sources that allegedly reflect how the rehabilitation community and

27  the Commissioner outside of a litigation context views the question of transferability.
    These authorities do not support Nunez's argument that a VE must rely on matching

28  MPSMS codes.  JS 23.

Global Assessment of Functioning ("GAF") score of 56.[7]  AR 535-36.  Nunez was cooperative, her effort was adequate and her response time was slow.  AR 535. Nunez's speech was clear and her thoughts appeared organized.  There was no evidence of psychomotor slowing.  Intellectual functioning and memory were in the low average range.  Nunez's mood was depressed and anxious.  Her concentration and attention span were poor.  Nunez was easily distracted; Dr. Gamboa had to ask questions a number of times.  Nunez's insight and judgment were in the low average range.  Dr. Gamboa opined that Nunez "seem[s] to have a significant depression and anxiety which appears to stem from her physical pain."  *Id.*

According to Dr. Gamboa, Nunez has a mild inability to understand, remember and carry out short and simplistic instructions without difficulty; a moderate inability to understand, remember and carry out detailed instructions; a mild inability to make simplistic work-related decisions without special supervision; and a moderate inability to interact appropriately with supervisors, coworkers and peers.  AR 536.  Nunez "struggled with speaking and maintaining an appropriate conversation with the examiner.  She seemed to . . . really be in pain which was evident in her expression." AR 536.

The ALJ gave "little weight" to Dr. Gamboa's opinion.  AR 35-36.  Dr. Gamboa did not have the benefit of reviewing Nunez's medical records (AR 534), which evidence minimal treatment for depression and indicate Nunez's depression caused no more than mild limitations in any functional domain.  AR 36.

Nunez contends that "lack of treatment is not a basis for rejecting a mental impairment."  JS 25 (citing *Nguyen v. Chater*, 100 F.3d 1462, 1465 (9th Cir. 1996)). She argues the ALJ "preferred his own analysis of the treatment history" over Dr.

---

[7]  A GAF score of 51-60 indicates "[m]oderate symptoms (e.g., flat affect and circumstantial speech, occasional panic attacks) or moderate difficulty in social, occupational, or school functioning (e.g., few friends, conflicts with peers or coworkers). Diagnostic and Statistical Manual of Mental Disorders 34 (4th ed. text rev. 2000).

Gamboa's opinion.  JS 28.  The Commissioner argues the ALJ properly discounted Dr. Gamboa's opinion based on minimal treatment.

In *Nguyen*, the Ninth Circuit held that the ALJ erred in failing to give "specific, legitimate reasons" for rejecting an examining psychologist's opinion.  The court noted that the ALJ could not reject the psychologist's opinion simply because the claimant did not seek treatment for his "mental disorder until late in the day."  100 F.3d at 1465 (citing *Blankenship v. Bowen*, 874 F.2d 1116, 1124 (6th Cir. 1989) ("[a]ppellant may have failed to seek psychiatric treatment for his mental condition, but it is a questionable practice to chastise one with a mental impairment for the exercise of poor judgment in seeking rehabilitation.")).  Here, in contrast to *Nguyen*, Nunez was aware of her history of depression, sought treatment for her mental condition, and was treated conservatively by her primary care physician.

Moreover, Dr. Gamboa observed Nunez in severe pain in January 2011, prior to her back surgery in March 2011.  AR 33.  Even so, as the ALJ noted, her medical records on January 29, 2011 indicate Nunez was working out at the gym when she hit her right rib on an exercise machine.  AR 33, 589.  The ALJ found that the surgery relieved some of Nunez's symptoms.  AR 30, 33, 662.  In June 2011, the medical records indicate Nunez was doing exceptionally well after surgery.  AR 33, 661. Nunez's depression "is much better now that her back pain is better post op."  AR 806.[8] Nunez testified that she takes Wellbutrin and Paxil for depression as prescribed by her primary care physician, Dr. Madrid.  AR 36, 55, 200.  Dr. Madrid indicated in treatment

---

[8]  Previously, the ALJ noted that by April 2009, Nunez had discussed weaning off Wellbutrin.  AR 26, 386.  A June 22, 2009 treatment note indicates that Nunez's psychiatric condition was normal, she was alert and oriented to time, place and person, and her mood and affect appeared appropriate.  AR 286-87.  She denied psychological problems or depression in progress reports from September 2009 through March 2010. AR 335-68.  During an August 25, 2010 appointment, Nunez reported feeling stressed due to finances, feeling depressed, and spending a lot of time in bed.  AR 26-27, 374. The family nurse practitioner wrote, "Ref. to Psychiatrist."  There is no indication in the record that Nunez began treatment with a psychiatrist.  AR 374.

1   notes that Nunez was cooperative, and had appropriate mood/affect and normal

2   judgment.  AR 797,[9] 800, 802, 806.  The ALJ could reasonably conclude that Dr.

3   Gamboa's opinion was not supported by the longitudinal objective medical evidence.

4   The ALJ did not err.

5           **E.       Opinion of Non-Examining Physician**

6           Nunez contends the ALJ erred in rejecting the opinion of the state agency

7   reviewing physician, Dr. Rankin.

8           "'The opinion of a nonexamining physician cannot by itself constitute substantial

9   evidence that justifies the rejection of the opinion of either an examining physician *or* a

10  treating physician.'"  *Ryan v. Comm'r of Soc. Sec. Admin.*, 528 F.3d 1194, 1202 (9th

11  Cir. 2008) (citation omitted) (emphasis in original).  However, a non-examining

12  physician's opinion may constitute substantial evidence when it is supported by other

13  evidence in the record and is consistent with it.  *Andrews v. Shalala*, 53 F.3d 1035,

14  1041 (9th Cir. 1995).

15          On January 27, 2011, Dr. Rankin completed a Mental Residual Functional

16  Capacity Assessment.  AR 574-77.  He acknowledged significant depressive

17  symptoms, but found that Nunez's functional limitations "do not appear to be of a

18  degree that would preclude all forms of employment."  AR 576-77.  Nunez is moderately

19  limited in the ability to understand and remember detailed instructions, the ability to

20  carry out detailed instructions, the ability to maintain attention and concentration for

21  extended periods, the ability to sustain an ordinary routine without special supervision,

22  the ability to complete a normal workday and workweek without interruptions from

23  psychologically based symptoms, the ability to accept instructions and respond

24  appropriately to criticism from supervisors, the ability to respond appropriately to

25  changes in the work setting, and the ability to set realistic goals or make plans

26  independently of others.  AR 576.  Nunez is not significantly limited in the remaining

27

28          [9]  These notes also indicate Nunez exercised 5-6 times per week, including aerobics, bicycling and walking.  AR 797.

areas.  Nunez could "perform work where interpersonal contact is incidental to work performed, e.g. assembly work; complexity of tasks is learned and performed by rote, few variables, little judgment; supervision required is simple, direct and concrete (unskilled)."  *Id.*

The ALJ gave "limited weight" to Dr. Rankin's opinion.  AR 36.  The ALJ found that the record evidence evidenced minimal treatment for depression (consisting of prescription medication prescribed by her primary care physician) and indicated no more than mild limitations in any functional domain.  *Id.*

The ALJ's analysis is supported by substantial evidence.  Dr. Rankin's opinion is inconsistent with that of Dr. Gamboa, the examining physician.  The ALJ could reasonably find that the objective medical evidence did not support Dr. Rankin's opinion that limited Nunez to unskilled work.

The ALJ did not err.

**IV.**

**ORDER**

IT IS HEREBY ORDERED that the decision of the Commissioner is affirmed.

IT IS FURTHER ORDERED that the Clerk serve copies of this Order and the Judgment herein on all parties or their counsel.


DATED: September 22, 2014

_____
ALICIA G. ROSENBERG
United States Magistrate Judge